UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICE BOOTHE, as next friend of K.C., a minor, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 7228 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| WHEELING POLICE OFFICER SHERMAN (Star #155), VILLAGE OF WHEELING, TOWNSHIP HIGH SCHOOL DISTRICT 214, RAMONE WILLIAMS, and DERRICK WILLIAMSON, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Patrice Boothe, the mother and next friend of K.C., at all relevant times a student at Wheeling High School, brought this suit against the Village of Wheeling and Wheeling police officer Adam Sherman (together, "Village Defendants"), as well as Township High School District 214, Ramone Williams, and Derrick Williamson (collectively, "District Defendants"), alleging that they violated state and federal law in connection with Sherman's arrest of K.C. at the high school on October 11, 2012. Docs. 1, 47. Earlier in the litigation, the court stayed several claims pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), pending the completion of state criminal proceedings against K.C. Docs. 40-41 (reported at 66 F. Supp. 3d 1069 (N.D. Ill. 2014)). After the state case ended with K.C.'s conviction for resisting arrest, Doc. 100-9 at 50-53, Boothe voluntarily dismissed some claims, Doc. 55. The remaining claims are: a Fourth Amendment excessive force claim (Count I); a state law assault claim (Count VI); a state law battery claim (Count VII); a state law spoliation of evidence claim (Count X); and state law indemnity and *respondeat superior* claims against the Village and District 214 arising from

1

Sherman's, Williams's, and Williamson's conduct (Counts XI-XII).  Docs. 47, 55.  A jury trial is set for October 17, 2016.  Doc. 116.

District 214 seeks summary judgment on the excessive force, assault, and battery claims, and also on the indemnity and *respondeat superior* claims as they pertain to Sherman's conduct. Doc. 96.  Boothe does not contest this motion, Doc. 106 at 8, so it is granted.  In addition, District Defendants have moved for summary judgment on the spoliation claim, Doc. 96, while Village Defendants have moved for summary judgment on all claims, Doc. 99.  District Defendants' motion is denied, while Village Defendants' motion is granted as to part of the excessive force claim and otherwise is denied.

## Background

Before setting forth the facts, the court addresses some evidentiary and Local Rule 56.1 issues.

First, Boothe moves to strike several paragraphs in Village Defendants' Local Rule 56.1(a)(3) statement on the ground that they cite to "several pages" of deposition transcript. Doc. 109 at 6.  It is true that "citations [in a Local Rule 56.1 statement] must include page (or paragraph) numbers as opposed to simply citing an entire deposition." *De v. City of Chicago*, 912 F. Supp. 2d 709, 711 (N.D. Ill. 2012) (internal quotation marks omitted); *see also Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004).  However, Village Defendants support all of the challenged paragraphs with citations to one or very few pages of deposition transcript, which is perfectly acceptable.  Doc. 108 at ¶¶ 8-13, 17, 19, 21, 24-26, 29-31, 34, 44-45, 50.  Those paragraphs are not stricken.  Boothe's motion to strike ¶ 49 of District Defendants' Local Rule 56.1(a)(3) statement for citing 44 pages of deposition transcript, Doc. 105 at ¶ 49, is denied as moot because that paragraph is not material on summary judgment.

Second, Boothe moves to strike ¶ 57 of District Defendants' Local Rule 56.1(a)(3) statement. *Id*. at ¶ 57. Paragraph 57 reads:

> At approximately the same time [as that in the surveillance video produced in this case], video footage from other cameras in the vicinity of the cafeteria also had gaps in the recordings. (Ex. A [Boothe Deposition], pp. 37-44, Ex. C [Williamson Deposition], pp. 125-135, Ex. F (Sherman Deposition), [p.] 164 *see also* surveillance video.)

*Ibid*. To support ¶ 57, District Defendants do not cite the actual video footage from the other cameras; instead, they rely on Boothe's, Williamson's, and Sherman's deposition testimony. During those depositions, counsel for District Defendants played video footage from the other cameras and asked whether the time stamps and images in the videos indicated that they skipped; the deponents answered in the affirmative. Doc. 96-1 at 11-12, 120-122, 292. Boothe does not challenge the authenticity of the video footage shown during the depositions.

Boothe argues that ¶ 57 rests on inadmissible hearsay. "To be considered" on summary judgment, evidence "must either be non-hearsay pursuant to Federal Rule of Evidence 801, or must qualify for a hearsay exception pursuant to Federal Rule of Evidence 803." *Wigod v. Chi. Mercantile Exch.*, 981 F.2d 1510, 1519 (7th Cir. 1992); *see also Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). Rule 801 defines as hearsay "a *statement* that … the *declarant* does not make while testifying at the current trial or hearing." Fed. R. Evid. 801(c) (emphases added). The Rule in turn defines "statement" as "a *person*'s oral assertion, written assertion, or nonverbal conduct," and a "declarant" as "the *person* who made the statement." Fed. R. Evid. 801(a)-(b) (emphases added). As the Rule's text suggests, "only a *person* may be a declarant and make a statement." *United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007). Thus, the time stamps on the video footage, which are raw data generated by a machine rather than statements by a declarant, are not hearsay. *See United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008)

3

("[T]he instruments' [an infrared spectrometer and a gas chromatograph] readouts are not 'statements.'"); *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109-10 (9th Cir. 2015) ("A tack placed by the Google Earth program and automatically labeled with GPS coordinates isn't hearsay. The hearsay rule applies only to out-of-court *statements* …. Here, the relevant assertion isn't made by a person; it's made by the Google Earth program …. In reaching that conclusion, we join other circuits that have held that machine statements aren't hearsay."); *Patterson v. City of Akron*, 619 F. App'x 462, 480 (6th Cir. 2015) (collecting cases and noting that "numerous circuit courts have held that statements made by machines are not hearsay"); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003) ("[U]nder FRE 801(a), a statement is something uttered by 'a person,' so nothing 'said' by a machine is hearsay.") (internal quotation marks omitted). And because the videos were shown at their depositions, Boothe, Williams, and Williamson undisputedly could testify about their observations thereof.

District Defendants' ¶ 57 thus does not rest on hearsay. Boothe's other ground for striking ¶ 57, that "Defendants fail to make specific reference to what videos they are referring to," Doc. 105 at ¶ 57, is similarly meritless, because District Defendants' Local Rule 56.1(a)(3) statement makes clear that "other cameras in the vicinity of the cafeteria" are the cameras labeled A36, A37, A43, and A44. *Id*. at ¶ 44. Boothe's motion to strike ¶ 57 is therefore denied.

Third, Boothe moves to strike ¶ 46 of District Defendants' Local Rule 56.1(a)(3) statement on hearsay grounds, Doc. 105 at ¶ 46, and Village Defendants move to strike ¶ 17 of Boothe's Local Rule 56.1(b)(3)(C) statement for mischaracterizing the record, Doc. 113 at ¶ 17. Both motions are denied as moot because the paragraphs are not material on summary judgment.

Fourth, District Defendants deny ¶¶ 2-6 and 26 of Boothe's Local Rule 56.1(b)(3)(C) statement without citing any record material. Doc. 111 at ¶¶ 2-6, 26. This violates Local Rule

4

56.1(a), which requires a movant's reply to be "in the form prescribed in" Local Rule 56.1(b)(3)(B), which in turn requires the inclusion of "references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56.1(b)(3)(B). Accordingly, ¶¶ 2-6 and 26 of Boothe's Local Rule 56.1(b)(3)(C) statement are deemed admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

With that said, the following facts are set forth as favorably to Boothe, the non-movant, as the record and Local Rule 56.1 allow. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). In considering Defendants' summary judgment motions, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

On October 11, 2012, K.C. arrived at Wheeling High School seeking to confront another student. Doc. 108 at ¶¶ 9-10. K.C. was fifteen years old, 5'4", and 150 pounds. Doc. 113 at ¶ 1. When K.C. confronted the other student in the school cafeteria, a fight involving at least nine students broke out. Doc. 108 at ¶¶ 10-12. Sherman, the on-duty police officer at the school, responded to a radio call, entered the cafeteria, observed the fight, and told K.C. to stop fighting and to release the student she was holding. *Id.* at ¶¶ 14-15, 17. K.C. released the student, and Sherman, holding K.C.'s hands behind her back, began to escort her from the cafeteria. *Id.* at ¶¶ 17-19; Doc. 113 at ¶ 6. Sherman was 6'1" and weighed 190 pounds. *Id.* at ¶ 2.

As Sherman escorted her from the cafeteria, K.C. pulled her arms free in an attempt to wipe her eye; believing that K.C. was about to punch him, Sherman attempted to perform a "straight-arm takedown." Doc. 108 at ¶¶ 20-25; Doc. 113 at ¶¶ 3-4, 9-11. While performing that maneuver, which Boothe characterizes as a "body slam[]" and which K.C. testified was like

5

being "tripped and pushed down," Sherman pushed K.C. to the ground, fell on top of her, and handcuffed her. Doc. 108 at ¶¶ 29-30, 39; Doc. 113 at ¶ 12. K.C. did not resist Sherman while she was on the ground, and she obeyed his directive to give him her hands to be handcuffed. Doc. 108 at ¶¶ 30-31, 35. When he was on the ground, Sherman held K.C.'s neck and dug his knee into her back. *Id*. at ¶¶ 30-31, 39; Doc. 113 at ¶¶ 14-15. K.C. testified that when Sherman performed the takedown, her face slammed into or hit the floor, and also that Sherman dug his knee into her back for the approximately one minute that is missing from the surveillance video of the incident (of which more later). Doc. 105 at ¶ 58; Doc. 108 at ¶¶ 37-38, 40; Doc. 111 at ¶ 5; Doc. 113 at ¶ 16. Once she was on the floor, K.C. did not attempt to pull away from Sherman and did not attempt move her arms or legs in any way until Sherman instructed her to do so. Doc. 108 at ¶¶ 30-31, 35.

After handcuffing K.C., Sherman told her to stand and walked her to a bench. Doc. 108 at ¶ 41. Another officer transported K.C. to the Wheeling Police Department. *Ibid*. At the police station, K.C. reported that her eye was injured and that she could not breathe. *Id*. at ¶ 42. K.C. sought medical treatment that day. Doc. 113 at ¶ 19.

During an interview at the police station, K.C. admitted that she had been ordered to stop fighting and had tried to pull her arms free from Sherman. Doc. 108 at ¶¶ 48-50. After an investigation, the Wheeling Police Department concluded that Sherman's use of force was proper. *Id*. at ¶ 52. K.C. was criminally charged with resisting arrest and was found guilty at a bench trial in late 2014. *Id*. at ¶¶ 53-54.

Sherman's takedown of K.C. was captured by surveillance camera A35. Doc. 105 at ¶¶ 41, 48. The next day, October 12, 2012, Sherman asked Williamson, the high school's technology systems supervisor, to copy the pertinent portion of the video. *Id*. at ¶ 49.

Williamson was the only person at the school at the time who knew how to capture the requested video and put it on a CD. *Id*. at ¶ 50; Doc. 111 at ¶ 27. In complying with Sherman's request, Williamson decided when to begin and end the recording and whether to encrypt it. Doc. 105 at ¶¶ 51-52; Doc. 111 at ¶¶ 15-20. The video that Williamson created, which lasts just over six minutes, shows students rushing through the hallway for about four minutes, Sherman performing the takedown of K.C., and the incident's aftermath. Doc. 105 at ¶ 51.

Williamson gave the video to Sherman on October 12, 2012, and Sherman took it that day to the evidence lockbox at the Wheeling Police Department. *Id*. at ¶ 53. The footage from camera A35 produced in this case has a 69-second gap about five minutes into the video, causing it to jump from 9:25:24 a.m. to 9:26:33 a.m. *Id*. at ¶ 56; Doc. 111 at ¶ 21. Footage from other cameras, which also had gaps in their recordings, was placed into the evidence lockbox as well. Doc. 105 at ¶¶ 54, 57.

Also on October 12, 2012, Boothe, Sherman, K.C., and Williams (a dean at the high school) gathered in Williams's office to watch surveillance footage of the takedown and arrest. Doc. 111 at ¶¶ 1, 22. The video that Boothe viewed in Williams's office differs from the video produced in this case in two respects: (1) it did not have the 69-second gap or any other skips and jumps; and (2) it showed the incident from a different camera angle. Doc. 105 at ¶ 59; Doc. 111 at ¶ 2-3, 6. After viewing the video in Williams's office, Boothe submitted a Freedom of Information Act request to the District to preserve any videos of the incident and to provide her with copies. Doc. 111 at ¶ 4.

In K.C.'s state court criminal case, District Defendants produced the same video produced in this case. They maintained in the criminal case that the 69-second gap was due to motion sensors that govern what the camera records. *Id*. at ¶ 25. In this case, by contrast, they

maintain that the gap resulted from "the network being busy, data collisions, and the imperfections in the surveillance video." Doc. 105 at ¶ 47. The state court held that the video was "of no relevance" and "lacking because of the placement of the cameras," *id*. at ¶ 63, though it also found in denying K.C.'s motion to dismiss on *Brady* grounds that "there is a tape different from the ones that were introduced here in court," Doc. 111 at ¶ 7.

Once the high school's hard drives are full, which typically occurs every thirty days, they are automatically purged. *Id*. at ¶ 8. Videos are not purged if an authorized user marks them as "archived." *Id*. at ¶ 10. Videos marked as archived are not deleted on the standard thirty-day schedule; only an authorized user can delete the video. *Id*. at ¶¶ 10, 13. In October 2012, only Keith Bockwoldt, the high school's director of technology services, Doc. 96-2 at 101, and Williamson had the access required to mark a video as archived, Doc. 111 at ¶ 12.

**Discussion**

**I. Fourth Amendment Excessive Force Claim (Count I)**

The Fourth Amendment claim alleges that Sherman used excessive force when he took K.C. to the ground, fell on her, kneed her in the back for a minute, and held her neck. Doc. 47 at ¶¶ 43-47. The Seventh Circuit has cautioned that "[s]ummary judgment is often inappropriate in excessive force cases" because "the parties typically tell different stories about what happened," *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009), and also because "evidence surrounding the officer's use of force is often susceptible to different interpretations," *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). *See Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 n.4 (7th Cir. 2012) ("We certainly agree that summary judgment is frequently inappropriate in excessive force cases."). That said, the plaintiff "bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient

evidence to create genuine issues of material fact to avoid summary judgment." *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011) (internal quotation marks omitted).

Sherman seeks summary judgment on the excessive force claim, arguing that he is entitled to qualified immunity. Doc. 101 at 8-11; Doc. 114 at 5-7. "Two central questions must be addressed in the course of determining whether qualified immunity is available: whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (internal quotation marks omitted). In addressing these questions, the court will separately consider two aspects of Sherman's alleged conduct—first, the straight-arm takedown, and second, Sherman's digging his knee into K.C.'s back and holding her neck once she was on the ground.

### A. Sherman's Conduct Once K.C. Was on the Ground

The first question is whether Sherman violated the Fourth Amendment when he dug his knee into K.C.'s back and held her neck for the approximately one minute she was on the ground. "Excessive force claims are reviewed under the Fourth Amendment's objective reasonableness standard," which considers "the perspective of a reasonable officer under the circumstances, rather than … in hindsight." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)). "A police officer's use of force is unconstitutional if, judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Becker v. Elfreich*, __ F.3d __, 2016 WL 2754023, at *3 (7th Cir. May 12, 2016) (internal quotation marks omitted). "In determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment," the court "must balance the nature and quality of the intrusion on the

9

individual's Fourth Amendment interest against the importance of the governmental interest alleged to justify the intrusion." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472 (7th Cir. 2015). In so doing, the

> court addresses several factors to determine the reasonableness of an officer's actions under the circumstances, including the severity of the crime; whether the suspect posed an immediate threat to the officer[] or others; whether the suspect was resisting or evading arrest; whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties.

*Dawson*, 803 F.3d at 833. When an individual is resisting arrest, an officer can use the amount of force necessary to overcome her resistance. *See Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) ("An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest."); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592-93 (7th Cir. 1997).

The court is mindful that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted). Still, Sherman has not established as a matter of law that his actions once K.C. was on the ground were objectively reasonable. Viewing the facts in the light most favorable to Boothe, after body slamming and falling on top of K.C., Sherman held her neck and dug his knee into her back for about one minute—even though, once on the ground, she did not attempt to pull away or to move her arms or legs in any way until he instructed her to do so. Applying the pertinent factors, *see Dawson*, 803 F.3d at 833, the force Sherman applied was constitutionally excessive: K.C.'s crimes (fighting, and then resisting arrest by pulling away her arm to wipe her eye) were not severe; she posed little threat to Sherman or others; she was unarmed; and at the time she was on the ground, she was not attempting to interfere with

10

Sherman's duties. It follows that a genuine issue of material fact exists as to "whether the force used" once K.C. was on the ground "was excessive in relation to the danger [K.C.] posed" to Sherman and the other students. *Ibid*. (internal quotation marks omitted).

The cases cited by Village Defendants, *Smith v. Ball State University*, 295 F.3d 763 (7th Cir. 2002), and *Tom v. Voida*, 963 F.2d 952, 958 (7th Cir. 1992), are distinguishable. In *Smith*, officers used a "straight arm bar" technique to remove an apparently intoxicated driver from behind the wheel of a running automobile that had driven onto a college campus sidewalk. 295 F.3d at 766, 770. The Seventh Circuit held that "no reasonable jury could conclude that the Defendants used excessive force in detaining Smith" after he had failed to obey an order to exit his car, "particularly given the potential threat to public safety of an intoxicated driver in command of a running vehicle." *Id*. at 770. *Tom* concerned a suspect who had fled and then twice violently attacked a police officer. 963 F.2d at 955. Unlike K.C., a fifteen-year-old student who had already been subdued, the plaintiffs in those cases clearly posed the kind of significant threat to "public safety" that justified the officers' use of force.

Village Defendants also argue that Boothe's excessive force claim is "inherently inconsistent" with K.C.'s resisting arrest conviction, and thus is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Doc. 114 at 4-5. *Heck* precludes a § 1983 plaintiff from bringing a claim that, if successful, "would necessarily imply the invalidity of his conviction or sentence." 512 U.S. at 487. But K.C. claims that Sherman used an excessive amount of force (holding her neck, kneeing her in the back) *even assuming* she had earlier resisted arrest; that claim is not necessarily inconsistent with the resisting arrest conviction. *See Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010) (holding that an excessive force claim does not necessarily imply the invalidity of a resisting arrest conviction); *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 764

11

(7th Cir. 2008) ("The fact that Hardrick 'struggled while being handcuffed' at one point in time does not preclude the possibility that at another point in time, Hardrick was 'peaceably waiting to be handcuffed.' Whether a fact-finder would find this scenario plausible is not for us to conclude, but in terms of *Heck*, it is not one that necessarily implies the validity of the conviction, and does not bar Hardrick's excessive force claim.") (internal quotation marks omitted); *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006) ("As a general proposition, a plaintiff who has been convicted of resisting arrest or assaulting a police officer during the course of an arrest is not *per se Heck*-barred from maintaining a § 1983 action for excessive force stemming from the same confrontation."); *see also Hill v. Murphy*, 785 F.3d 242, 250 (7th Cir. 2015) (noting that "most Fourth Amendment claims survive *Heck*"). In any event, Village Defendants forfeited their *Heck* argument by not raising it until their reply brief. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

Because the record would allow a reasonable jury to find that Sherman violated the Fourth Amendment with respect to his conduct once K.C. had been brought to the ground, Boothe has met her "burden of establishing that … [K.C.'s] rights were violated." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). The next question is whether that conduct clearly violated the Fourth Amendment. "The doctrine of qualified immunity protects government officials from liability when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alicea v. Thomas*, 815

F.3d 283, 291 (7th Cir. 2016); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam); *Burritt*, 807 F.3d at 249. "Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

For Boothe to avoid judgment on qualified immunity grounds, the Fourth Amendment right that Sherman allegedly violated must have been clearly established as of October 2012 "in a particularized sense" and not merely "at a high level of generality." *Alicea*, 815 F.3d at 291; *see also Mullenix*, 136 S. Ct. at 308 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotation marks omitted); *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015). "The basic question is whether the state of the law at the time that [Sherman] acted gave him reasonable notice that his actions violated the Constitution." *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011).

In October 2012, it had long been settled "that police officers [may] not use significant force on nonresisting or passively resisting suspects." *Abbott v. Sangamon Cnty,*, 705 F.3d 706, 727 (7th Cir. 2013) (in a qualified immunity case, collecting cases from 1995, 1996, and 2003 to support the proposition that this principle was "well-established in" the Seventh Circuit "[p]rior to 2007"); *see also Becker*, 2016 WL 2754023, at *7 ("[P]rior to 2011 … it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects") (internal quotation marks omitted); *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) ("Officer Pauley's force in arresting a woman who was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting

13

to flee, and was charged with such minor offenses, was not objectively reasonable."). "Rather, only a minimal amount of force may be used on such arrestees." *Abbott*, 705 F.3d at 732.

As noted, and viewing the record in the light most favorable to Boothe, K.C. stopped resisting once she had been brought to the ground, and yet Sherman proceeded to dig his knee into her back and hold her neck for over a minute—a time period, it bears mention, that directly corresponds with the gap in the A35 surveillance video. "[P]rior to 2011, it was well-established that police officers cannot continue to use force once a suspect is subdued," *Becker*, 2016 WL 2754023, at *6; *see also Abbott*, 705 F.3d at 732 ("[I]t was well-established in 2007 that police officers cannot continue to use force once a suspect is subdued."), and "[f]orce is reasonable only when exercised in proportion to the threat posed, and, as the threat changes, so too should the degree of force." *Cyrus*, 624 F.3d at 863. Sherman continued to apply substantial force once K.C. was on the ground and subdued. Boothe therefore has established that "that it was objectively unreasonable for [Sherman] to believe that the force" he used when K.C. was on the ground and no longer resisting "was lawful." *Williams*, 797 F.3d at 473 (internal quotation marks omitted). It follows that Sherman is not entitled to qualified immunity as it pertains to his conduct after K.C. was brought to the ground.

### B. Sherman's Straight-Arm Takedown of K.C.

Rather than decide whether Sherman's straight-arm takedown of K.C. violated the Fourth Amendment, the court will exercise its discretion to begin with the second qualified immunity question, which is whether the takedown violated clearly established law. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Mordi v. Zeigler*, 770 F.3d 1161, 1165 (7th Cir. 2014). K.C. may have stopped resisting once she was on the ground, but, as the state court held beyond a reasonable doubt, she was resisting when Sherman was escorting her from the cafeteria.

14

As noted, police officers are entitled to use appropriate force to effectuate an arrest when a suspect is resisting. *See Stainback*, 569 F.3d at 772; *Estate of Phillips*, 123 F.3d at 592-93. Under Seventh Circuit precedent, because K.C. was resisting, Sherman was entitled to subdue her. *See Brooks v. City of Aurora*, 653 F.3d 478, 481-82, 486 (7th Cir. 2011) (holding that arresting officers did not use excessive force when using pepper spray against a suspect who had "communicated his willingness to submit to arrest" but was backpedaling and attempting to knock away the officers' hands); *Stainback*, 569 F.3d at 772 (holding that officers did not use excessive force in forcibly handcuffing a suspect who had complied with the officers' requests to turn around and face a wall, but not with an order to put his hands behind his back). And as to the method of subduing K.C., Boothe has not shown that "existing precedent" in October 2012 had "placed the … constitutional question" of whether a straight-arm takedown was permissible "beyond debate." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted). Sherman therefore was not on reasonable notice that a straight-arm takedown would have violated the Fourth Amendment. *See Dawson*, 803 F.3d at 834 (affirming summary judgment and holding that an officer "could reasonably believe it was necessary to tackle" a 72-year-old man who was non-violently interfering with his son's arrest); *Findlay v. Lendermon*, 722 F.3d 895, 899-900 (7th Cir. 2013) (holding that an officer who tackled a non-violent suspect was entitled to qualified immunity on an excessive force claim); *Fitzgerald v. Santoro*, 707 F.3d 725, 733-34 (7th Cir. 2013) (holding that an arresting officer's use of "arm bar" and "wrist lock" techniques on a resisting female suspect were not excessive). At a minimum, Sherman's takedown of K.C. lies "in the hazy border between excessive and acceptable force," *Mullenix*, 136 S. Ct. at 312 (internal quotation marks omitted), and thus is protected by qualified immunity.

For these reasons, summary judgment is granted on the Fourth Amendment claim to the extent it pertains to Sherman's takedown of K.C., but is denied to the extent it pertains to what occurred once K.C. was on the ground.

## II. State Law Claims Against Village Defendants (Counts VI-VII, XI-XII)

Village Defendants seek summary judgment on Boothe's state law assault and battery claims (Counts VI-VII) under § 2-202 of the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("TIA"), 745 ILCS 10/1-101 *et seq.* Doc. 101 at 11-12; Doc. 114 at 7. Section 2-202 provides in relevant part that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2–202. The TIA defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1–210.

Under Illinois law, "a police officer is not guilty of willful or wanton conduct unless he acted with actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others." *Chelios v. Heavener,* 520 F.3d 678, 693 (7th Cir. 2008) (internal quotation marks omitted). Although "[w]illful and wanton conduct … consists of more than mere inadvertence, incompetence, or unskillfulness," *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 920 (7th Cir. 2015) (internal quotation marks omitted), "it need not be an intentional act; rather, it may be an act committed under circumstances exhibiting a reckless disregard for the safety of others," *Chelios*, 520 F.3d at 693 (internal quotation marks omitted). "Whether an officer acted in such fashion is normally a question of fact to be determined by the jury." *Ibid.* (internal quotation marks omitted).

16

Accepting Boothe's version of events, Sherman's takedown of K.C. came after she had obeyed his orders to disengage from the fight, allowed him to escort her from the cafeteria, and then attempted to wipe her eye. Although K.C. was convicted for resisting arrest, a reasonable jury could (but need not) conclude that the manner of Sherman's takedown—the body slam and falling on top of her—reflected a "reckless disregard" for K.C.'s "safety" within the meaning of Illinois case law. *Ibid*. A reasonable jury certainly could find as much for Sherman's kneeing her in the back and holding her neck once she was subdued on the ground. It follows that Village Defendants' contention that Sherman was not behaving willfully or wantonly because "[e]ffecting an arrest is the execution or enforcement of a law" within the meaning of § 2-202 of the TIA, Doc. 101 at 11, fails to persuade. This claim concerns not Sherman's right to make an arrest, but rather the manner in which he made that arrest.

The Village derivatively seeks summary judgment on Boothe's indemnity and *respondeat superior* state law claims (Counts XI-XII) under § 2-109 of the TIA. Doc. 101 at 12. Section 2-109 provides in relevant part that a "local public entity [cannot be] liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. Because Sherman is not entitled to summary judgment on part of the Fourth Amendment claim and on the assault and battery claims against him, the Village cannot prevail under § 2-109.

### III. Negligent Spoliation Claim (Count X)

District Defendants seek summary judgment on Boothe's state law spoliation claim. Doc. 97 at 12-15; Doc. 112 at 1-3. The claim alleges that District Defendants breached their duty to preserve video footage from the surveillance cameras because the surveillance tape from camera A35 produced in this case contains a 69-second gap. Doc. 47 at ¶¶ 97-106.

17

"Under Illinois law spoliation of evidence is treated as a negligence action." *Duran v. Town of Cicero*, 653 F.3d 632, 644 (7th Cir. 2011) (citing *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 270-71 (Ill. 1995)); *see also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509-10 (7th Cir. 2007) ("[N]egligent spoliation is not itself an independent tort but rather a type of negligence."). "Accordingly, a plaintiff claiming spoliation of evidence must prove that: (1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) the loss or destruction of the evidence was the proximate cause of the plaintiff's inability to prove an underlying lawsuit; and (4) as a result, the plaintiff suffered actual damages." *Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22, 27 (Ill. 2012). Although the "general rule in Illinois is that there is no duty to preserve evidence," a "voluntary undertaking" may give rise to such a duty, particularly where "a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." *Id*. at 28.

District Defendants concede that they voluntarily undertook the preservation of the surveillance footage. Doc. 97 at 13. But they contend that they did not breach that duty because the 69-second gap in the footage from camera A35 was the result of network "data collisions," because no District 214 employee had the access necessary to alter the footage, and because evidence in the Wheeling Police Department lockbox could not be altered. *Id*. at 13-14. Those arguments fail to persuade on summary judgment.

First, the notion that network data collisions caused the gap in the video is inconsistent both with Boothe's contention that the video footage that she, K.C., Sherman, and Williams viewed in Williams's office on October 12, 2012 had no gaps, and with District Defendants' own assertion in the state criminal case that the gap was instead the result of motion sensors that

18

controlled camera A35.  These disparities give rise to triable issues of fact.  Second, even if no District employees had the access necessary to *alter* the surveillance footage, Williamson decided when to *stop and start* the video recording.  He also decided not to archive, copy to a CD, or otherwise preserve the footage from the entire day, which, given that it concerned the forcible arrest of a student on school premises, was foreseeably material to potential litigation. *See Martin*, 979 N.E.2d at 28.  The fact that the other surveillance video from cameras in the vicinity displayed similar gaps does not change this, for Williamson performed the necessary functions to capture material from those cameras as well.  Third, it is irrelevant whether evidence placed in the police department lockbox cannot be altered, because the spoliation claim concerns the handling of evidence *before* it was placed there.

With the gap in the video from the A35 camera presenting triable issues of fact that preclude summary judgment, the court need not address District Defendants' argument that Boothe and K.C. could not in Williams's office have seen a video from a different camera angle because no other camera was in position to capture the incident.  Doc. 97 at 14.  Even if District Defendants are correct, they would still not be entitled to summary judgment on the spoliation claim because the video produced in this case has a 69-second gap and the one that Boothe, K.C., Williams, and Sherman viewed on October 12, 2012 did not.

District Defendants also contend that any gap in the video "did not proximately cause K.C.'s conviction in the criminal court and will not proximately cause an inability to win this case." *Ibid*.  They note that the judge in the underlying criminal case found that the video had "no relevance," that K.C. has testified as to what occurred during the 69-second gap, and that Kenneth Stiff, a dean at the high school, provided eyewitness testimony of the incident.  *Id*. at 14-15.  All of this may be true, but none of it vitiates the possibility that the lost video evidence

could be a proximate cause of Boothe's inability to win *this* case. In a context-specific, fact-intensive inquiry of "fluid situations" such as the one giving rise to this lawsuit, *Williams*, 797 F.3d at 473, video evidence may "tell[] quite a different story" than documentary and testimonial evidence. *Scott v. Harris*, 550 U.S. 372, 379 (2007); *see also Thompson v. Mercer*, 762 F.3d 433, 439 (5th Cir. 2014) ("[T]he Thompsons' characterization of the scene is belied by the video evidence."); *United States v. Marcavage*, 609 F.3d 264, 285 (3d Cir. 2010) ("The video evidence … tells a very different story from the one the government evoked at trial."). This is particularly true here because the 69-second gap comes at a crucial time in K.C.'s arrest, when Sherman is on top of her on the ground and allegedly kneeing her in the back and holding her neck. As a result, the fact that the allegedly altered video had "no relevance" in the state court resisting arrest prosecution does not necessarily mean that it has no relevance to ascertaining whether Sherman used excessive force or committed assault or battery when making the arrest.

**Conclusion**

District 214 is granted summary judgment on the excessive force, assault, and battery claims, and also on the indemnity and *respondeat superior* claims as they pertain to Sherman's conduct. Village Defendants are granted summary judgment as to the part of the excessive force claim pertaining to Sherman's takedown of K.C. The summary judgment motions otherwise are denied, and the surviving claims will proceed to trial on October 17, 2016.

June 3, 2016

United States District Judge